UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

AMBER L.,                                   :
          Plaintiff,                        :
                                            :
          v.                                :          C.A. No. 24-0060MRD
                                            :
LELAND C. DUDEK,                            :
Acting Commissioner of Social Security,     :
          Defendant.                        :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

On May 13, 2022, Plaintiff Amber L.,[1] a "younger" individual, then aged twenty-four years old, who had been a college student and alleges no work history, filed a second application for Supplemental Security Income ("SSI") based on alleged autism, endometriosis, abdominal pain, social anxiety, depression, generalized anxiety, migraines, asthma, tachycardia, celiac disease, hypothyroidism and chronic fatigue. Tr. 29. Plaintiff claims onset of disability in 2018,[2] when Plaintiff was attending a college in New York, completing three years[3] before dropping out at the end of 2020. Tr. 235. An administrative law judge ("ALJ") relied on the record of no paid employment (Tr. 226) and Plaintiff's testimony of never having worked (Tr. 52) to find that Plaintiff had not engaged in substantial gainful activity since May 13, 2022, Tr. 25, although the record has references to freelance writing and writing for commissions during

---

[1] To avoid confusion regarding Plaintiff's gender identity, the Court has not used pronouns in this report and recommendation.

[2] The prior SSI application alleges onset of disability on January 1, 2018. Tr. 70. The pending application alleges onset on June 30, 2018. Tr. 81.

[3] E.g., Tr. 235 (on application, Plaintiff reports "completed: three years of college"); Tr. 323-24 (in June 2018, Plaintiff reports "currently a sophomore at Siena College"); Tr. 792-93 (in January 2020, Plaintiff reports "returning to [college]" and "excited . . . about the transition back to school"); Tr. 672-73 (in November 2020, Plaintiff reports taking "final exams"); Tr. 703 (as of September 2020, Plaintiff reports "doing really well in school").

the period of alleged disability both before and after Plaintiff filed the current disability application.[4]  Tr. 81.  Plaintiff's prior disability application (filed on December 22, 2020) was denied at the reconsideration phase.  See Tr. 70-78.  Because Plaintiff seeks only SSI benefits, the period in issue for the current application begins on the date it was filed (May 13, 2022) and runs through the date of the adverse decision of the ALJ, which issued on November 24, 2023. See Tr. 37.

## I.    The ALJ's Adverse Decision

In his decision, the ALJ carefully considered the opinions submitted by Plaintiff's treating primary care nurse practitioner at Thundermist (N.P. Alexandra Gottier), Tr. 1693-96, who opined to extreme physical limits due to pain and fatigue persisting over the prior ten years, and treating psychologist (Dr. Erin Rabideau), who refused to provide a copy of the current treating record, but submitted three opinions, which state *inter alia* that Plaintiff is hospitalized once per month, unable to walk without a cane or wheelchair, often appears disheveled and ungroomed during remote sessions, is significantly impaired socially, struggles to concentrate and complete tasks, has cognitive difficulties with memory and processing speed, and uses the suicide hotline at least once a week because of depression, Tr. 1346, 1835-38, 1962-63.  See Tr. 33-35.  The ALJ found both treating source opinions to be unpersuasive.  Id.  In particular, the ALJ did not adopt their opinions that Plaintiff would be absent or off-task to a degree that precludes work.  Tr. 34-35.

---

[4] E.g., Tr. 323-24 (as of June 2018, Plaintiff "does freelance fan-fiction writing"); Tr. 669-70 (in November 2020, Plaintiff reports that "writing has helped improve . . . mood" and "has been planning to take more commission[s], which has felt good."); Tr. 740-44 (as of July 2020, Plaintiff reportedly "writing a lot recently" and "[c]urrently keeping busy by taking on writing commissions and painting"); Tr. 1858-59 (in March 2023, Plaintiff reports "doing some freelance writing work, hired recently by friend to do editing work").

As to physical symptoms, the ALJ considered the findings of three non-examining physician experts who performed the file review of the prior application and the current application – SSA[5] experts Drs. Gary Grosart, Mark Mahoney and Mitchell Pressman – all of whom found Plaintiff to be physically able to perform at least light work with postural and environmental limits.  Tr. 33.  As to Dr. Grosart, who opined regarding the prior application, the ALJ found Plaintiff to be far more limited and rejected his finding that Plaintiff can perform medium exertional work as unpersuasive because Dr. Grosart did not rely on the records submitted after his file review.  Id.  As to Drs. Mahoney and Pressman, the ALJ adopted their findings as to environmental limits, but found Plaintiff to be somewhat more limited (sedentary with significant postural limits) than their finding of the ability to perform light work, except that the ALJ (with an explanation) rejected their finding that Plaintiff can never stoop.  Tr. 33-34.

As to mental symptoms, the ALJ considered the findings of the three non-examining expert psychologists who reviewed the prior and current applications – SSA experts Drs. Marsha Hahn, Jeffrey Hughes and Janice Ritch.  They found that Plaintiff's statements regarding symptoms are only partially consistent with the evidence and that Plaintiff is moderately limited in the ability to function in the workplace but retains the ability to sustain a normal "8/5/40" work routine.  Tr. 74, 76, 88, 90-91, 99, 101-02.  As to Dr. Hahn, who opined in connection with the prior application, the ALJ adopted an RFC[6] that is somewhat more limited based on his

---

[5] "SSA" refers to the Social Security Administration, which engages non-examining expert physicians and psychologists to make findings based on the review of a disability applicant's record.  See Andrea T. v. Saul, C.A. No. 19-505WES, 2020 WL 2115898, at *1 (D.R.I. May 4, 2020).  The ALJ "must consider [these experts' findings] according to [20 C.F.R.] §§ 416.920b, 416.920c, and 416.927, as appropriate, because [the SSA's] Federal or State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."  20 C.F.R. § 416.913a(b)(1).

[6] RFC refers to "residual functional capacity."  It is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 416.945(a)(1).

3

conclusion that her findings are not persuasive because Dr. Hahn did not rely on the records submitted after her file review.  Tr. 33.  As to Drs. Hughes and Ritch, the ALJ found their findings to be persuasive and largely adopted them as his RFC findings, including their finding that Plaintiff's impairments do not cause work-preclusive absenteeism or off-task time.

In reliance on these findings and his analysis of the entire record, including treating records from both the prior and current applications, the ALJ declined to reopen Plaintiff's prior application, but found that, for the period covered by the current application, Plaintiff has suffered from an array of severe impairments – "obesity, asthma, migraines, status post left knee arthroscopy, endometriosis, autism spectrum disorder and post-traumatic stress disorder."  Tr. 25.  The ALJ concluded that these impairments have had a significant adverse impact on the ability to work, but that Plaintiff retains the physical RFC to perform sedentary work with significant postural and environmental limits and the mental RFC to work based on simple instructions, with limited social interaction (none with the public), only occasional changes in a routine work setting and no assembly or quota-based work.  Tr. 28-29.  In reliance on this RFC and testimony from a vocational expert, the ALJ concluded that Plaintiff has not been disabled at any relevant time.  Tr. 37.

## II.    The Parties' Motions

Plaintiff contends that the ALJ's decision is tainted by serious errors.  Plaintiff principally argues that the ALJ erred by failing to include the absenteeism and off-task-time limitations in the two treating source (N.P. Gottier and Dr. Rabideau) opinions based on the sheer volume of medical treatment Plaintiff has sought; Plaintiff analogizes the amount of time invested in "obtaining medical treatment" to a "full time job."  ECF No. 11-1 at 44 (citing Denise D. v. O'Malley, C.A. No. 23-233-PAS, 2024 WL 3329473, at *7-8 (D.R.I. July 8, 2024); Jacquelyn V.

v. Kijakazi, C.A. No. 21-314MSM, 2023 WL 371976, at *1, *5-6 (D.R.I. Jan. 24, 2023), adopted by text order (D.R.I. Mar. 7, 2023)).  Relatedly, Plaintiff challenges the ALJ's approach to the Gottier and Rabideau opinions as violative of the requirement in 20 C.F.R. § 416.920c that "other factors" should be considered.  ECF No. 11-1 at 45-46.  Plaintiff further argues that the ALJ's reliance on the SSA experts is erroneous because they were not privy to a substantial tranche of post-file-review raw medical data.  Finally, Plaintiff argues that the ALJ's credibility finding lacks the support of substantial evidence because the decision fails to identify evidence that contradicts Plaintiff's subjective statements.

Based on these arguments, Plaintiff has filed a motion for reversal with an award of benefits or, alternatively, for remand for further proceedings.  ECF No. 11.  The Acting Commissioner ("Commissioner") has filed a counter motion (ECF No. 12) asking the Court to affirm because the ALJ's decision is consistent with applicable law and well supported by substantial evidence.  The parties' motions have been referred to me for report and recommendation.  See 28 U.S.C. § 636(b)(1)(B).

### III.    Standard of Review

As long as the correct legal standard is applied, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g), 1383(c)(3); see Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).  "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."  Biestek v. Berryhill, 587 U.S. 97, 103 (2019).  Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Though the difference is quite subtle, this standard is "somewhat less strict"

than the "clearly erroneous" standard that appellate courts use to review district court fact-finding. Dickinson v. Zurko, 527 U.S. 150, 153, 162-63 (1999) (cited with approval in Biestek, 587 U.S. at 103). Thus, substantial evidence is more than a scintilla – it must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. Irlanda Ortiz v. Sec'y of Health & Hum. Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam).

Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact. Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987) (per curiam); Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981). The determination of substantiality is based upon an evaluation of the record as a whole. Frustaglia v. Sec'y of Health & Hum. Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam); Brown v. Apfel, 71 F. Supp. 2d 28, 30 (D.R.I. 1999), aff'd, 230F.3d 1347 (1st Cir. 2000); see Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (per curiam) (court must consider evidence detracting from evidence on which Commissioner relied). The Court's role in reviewing the Commissioner's decision is limited. Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret or reweigh the evidence or otherwise substitute its own judgment for that of the Commissioner. Thomas P. v. Kijakazi, C.A. No. 21-00020-WES, 2022 WL 92651, at *8 (D.R.I. Jan. 10, 2022), adopted by text order (D.R.I. Mar. 31, 2022).

If the Court finds either that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim, the Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g). Allen v. Colvin, C.A. No. 13-781L, 2015 WL 906000, at *8 (D.R.I. Mar. 3,

2015).  If the Court finds that a judicial award of benefits would be proper because the proof is overwhelming, or the proof is very strong and there is no contrary evidence, the Court can remand for an award of benefits.  Sacilowski v. Saul, 959 F.3d 431, 433, 440-41 (1st Cir. 2020); Randy M. v. Kijakazi, C.A. No. 20-329JJM, 2021 WL 4551141, at *2 (D.R.I. Oct. 5, 2021), adopted by sealed order (D.R.I. Oct. 28, 2021).

## IV.    **Disability Determination**

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.605.  The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 416.905-11.

### A.    **The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. § 416.920(a).  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  Id. § 416.920(a)(4)(i).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. § 416.920(a)(4)(ii).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. § 416.920(a)(4)(iii).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. § 416.920(a)(4)(iv).  Fifth, if a claimant's impairments (considering RFC, age, education and past work) prevent doing other work that exists in the local or national economy, a finding of

disabled is warranted.  Id. § 416.920(a)(4)(v).  Significantly, the claimant bears the burden of proof at Steps One through Four, but the Commissioner bears the burden at Step Five. Sacilowski, 959 F.3d at 434; Wells v. Barnhart, 267 F. Supp. 2d 138, 143-44 (D. Mass. 2003) (five-step process applies to SSI and DIB claims).

### B.    Opinion Evidence

An ALJ must consider the persuasiveness of all medical opinions in a claimant's case record.  See 20 C.F.R. § 416.920c.  The most important factors to be considered when the Commissioner evaluates the persuasiveness of a medical opinion are supportability and consistency; these are usually the only factors the ALJ is required to articulate.  20 C.F.R. § 416.920c(b)(2); Elizabeth V. v. O'Malley, C.A. No. 23-00459-WES, 2024 WL 1460354, at *3 (D.R.I. Apr. 4, 2024), adopted by text order (D.R.I. Apr. 19, 2024).  Supportability refers to the quantum of relevant objective medical evidence and supporting explanations presented by a medical source to support the medical opinion or prior administrative medical findings; consistency refers to the degree to which a medical opinion or prior administrative medical finding is consistent with the evidence from other medical sources and nonmedical sources in the claim.  20 C.F.R. § 416.920c(c)(1)-(2).  A medical opinion lacking adequate supporting evidence, or one that is inconsistent with evidence from other sources, is not persuasive regardless of who made the medical opinion.  See Amanda B. v. Kijakazi, C.A. No. 21-308MSM, 2022 WL 3025752, at *2 (D.R.I. Aug. 1, 2022), adopted, 2022 WL 18910865 (D.R.I. Nov. 7, 2022).  Other factors that are weighed in light of all of the evidence in the record include the medical source's relationship with the claimant and specialization, as well as "other factors" that tend to support or contradict the medical opinion or finding.  See 20 C.F.R. § 416.920c(c)(3)-(5).  However, the ALJ is required to articulate his consideration of factors other

than consistency and supportability only when he has equally persuasive medical opinions or administrative findings about the same issue that are both supported and consistent but not the same; in that event, he is required to articulate the "other factors" that he relied on to resolve the conflict. 20 C.F.R. § 416.920c(b)(3).

It is well-settled that remand is required when the ALJ's decision is based on the findings of "state-agency physicians [who] were not privy to parts of [plaintiff's] medical record [which] detract from the weight that can be afforded their opinions." Ruben M. v. Saul, C.A. No. 19-119MSM, 2020 WL 39037, at *9 (D.R.I. Jan. 3, 2020) (some alterations in original) (internal quotation marks omitted), adopted, 2020 WL 555186 (D.R.I. Feb. 4, 2020); see Sandra C. v. Saul, C.A. No. 18-375JJM, 2019 WL 4127363, at *6 (D.R.I. Aug. 30, 2019) ("Remand is necessary to allow for an error-free evaluation of the complete record."), adopted by text order (D.R.I. Sept. 16, 2019). An ALJ cannot rely on a file review opinion if post-review developments reflect a significant worsening of the claimant's condition because such an opinion does not amount to substantial evidence. Kane C. v. Kijakazi, C.A. No. 20-381MSM, 2022 WL 168043, at *7 (D.R.I. Jan. 19, 2022), adopted by sealed text order (D.R.I. Feb. 4, 2022). On the other hand, an ALJ can review post-file review records without the assistance of a medical expert to determine whether they reflect worsening or symptoms more serious than those in the records seen by the non-examining experts. Michele S. v. Saul, C.A. No. 19-65WES, 2019 WL 6242655, at *8 (D.R.I. Nov. 22, 2019), adopted by text order (D.R.I. Dec. 13, 2019). That is, the ALJ may rely on his own common-sense observation that the post-review records are similar to or more benign than the pre-review records. Sanford v. Astrue, No. CA 07-183 M, 2009 WL 866845, at *8-10 (D.R.I. Mar. 30, 2009). To hold otherwise would inappropriately render an

SSA opinion irrelevant merely because the expert was not privy to updated medical records, which "'would defy logic and be a formula for paralysis.'" Kane C., 2022 WL 168043, at *7.

### C.    Absenteeism and Off-Task Time

When the symptoms of an impairment or a combination of different impairments, or the medically necessary treatment required by the impairments, would cause the claimant periodically to be off-task or unable to attend work, it is reversible error if the ALJ fails specifically to assess the issue of absenteeism. Jacquelyn V., 2023 WL 371976, at *1, *5-6 (remand required because non-examining experts and ALJ ignored cumulative impact of absenteeism undisputedly resulting from kidney stone disorder requiring hospitalization several times each year, rhinosinusitis requiring repeated surgeries, confirmed diagnoses of fibromyalgia and carpal tunnel syndrome, migraines that recurred despite improvement with medical treatment, as well as other disorders). Remand is similarly required if the ALJ relies on the findings of non-examining physician experts who did not address absenteeism because, for example, they did not see records establishing the sheer scope of claimant's many medical concerns. Jessica S. v. Kijakazi, C.A. No. 21-75MSM, 2022 WL 522561, at *4-6 (D.R.I. Feb. 22, 2022) (non-examining experts "did not have access to a sufficiently developed record to permit them even to consider how the total number of medical appointments and hospitalizations would impact work attendance"), adopted, 2022 WL 834019 (D.R.I. Mar. 21, 2022).

### D.    Assessment of Claimant's Subjective Statements

The ALJ must consider the claimant's subjective statements regarding the limitations caused by symptoms. Where an ALJ decides not to fully credit such statements, he must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Rohrberg v. Apfel, 26 F. Supp. 2d 303, 309 (D. Mass. 1998). A reviewing

court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. See Frustaglia, 829 F.2d at 195. However, in the absence of evidence that directly rebuts the claimant's testimony or presents some other reason to question its credibility, the ALJ must take the claimant's statements as true. Sacilowski, 959 F.3d at 441.

## V.    Factual Background and Analysis[7]

### A.    Period Prior to Current Application

Plaintiff, then twenty-two years old, filed a prior application on December 22, 2020. Tr. 70. In all, nearly six hundred pages related to medical treatment in this record are labeled as pertaining to the "prior" application. As a matter of discretion, the ALJ found that good cause did not exist to reopen the prior application. See 20 C.F.R. § 416.1488 (a determination or decision "may be reopened"). While Plaintiff contends this was error, it is not error requiring remand[8]; as the Commissioner rightly points out, the Court lacks jurisdiction to review the denial of a request to reopen. Califano v. Sanders, 430 U.S. 99, 107-09 (1977); see Dudley v. Sec'y of Health & Hum. Servs., 816 F.2d 792, 795 (1st Cir. 1987) ("decision not to reopen the prior

---

[7] The Court's summary of the factual background does not constitute findings of fact. Rather, it reflects the Court's survey of the factual evidence in the record to determine whether there is substantial evidence to support the ALJ's findings that a reasonable mind would accept as adequate. With apologies to the reader, the Court notes that this factual background is unusually detailed to respond to Plaintiff's arguments, particularly the contention that the sheer number of medical encounters would result absenteeism that is *per se* disabling.

[8] While not a basis for remand, Plaintiff contends that the facts pertaining to reopening should be considered by the Court in determining the fairness of the outcome, including whether to remand for further proceedings or to award benefits. See Ogannes B. v. Kijakazi, C.A. No. 22-325WES, 2023 WL 5561108, at *8 (D.R.I. Aug. 29, 2023) (troublingly erroneous but nonreviewable determinations adversely impacting claim support judicial decision to remand for award of benefits), adopted by text order (D.R.I. Sept. 13, 2023). In support of reopening, Plaintiff alleged not having received notice of the denial of the prior application and therefore failing to appeal the denial. Plaintiff suggests that this misunderstanding was caused by "mental illness," although the only cognitive testing of record reveals that Plaintiff enjoys a verbal comprehension ability that is "superior"/"very superior," nor is there any evidence of missed medical appointments or failure to attend appointments due to "mental illness." Tr. 331. And somewhat confusingly, Plaintiff did not ask that the December 22, 2020, application be reopened, instead asking the ALJ to reopen the "April 21, 2021 application," which this record does not reflect was ever filed. See Tr. 298. Despite this confusion, the ALJ considered whether to reopen the December 22, 2020, application and found no basis to do so. Tr. 23. In light of my determination that the evidence overall – both for the prior period and the current period – is more than adequate to support the ALJ's conclusion, I find no need to further consider these allegations.

application is not subject to judicial review by this court"). Nevertheless, Plaintiff argues that the Court should separately consider the evidence from this period as it performs its judicial task of determining whether the relevant evidence is such as "a reasonable mind might accept as adequate to support" the Commissioner's denial of benefits. See Biestek, 587 U.S. at 103. I agree; mindful that the two treating sources, the SSA experts and the ALJ all considered medical evidence from the prior application period, I have carefully reviewed this portion of the treating record.

The prior application contains a post-onset June 2018 psychological evaluation performed by a psychologist at Plaintiff's request because (in Plaintiff's words): "I would like to have an official diagnosis of autism and possibly OCD . . . . I am also planning on applying for disability, so I would appreciate any help that can be provided with that." Tr. 344. This lengthy and detailed evaluation included testing resulting in the assessment that Plaintiff has average cognitive functioning, except that Plaintiff's verbal/language abilities fall into the superior/very superior range. Tr. 327, 331-32. Despite no childhood diagnosis of autism, no IEP or 504 plan adopted during schooling, and "a difference between observational and subjective measures," with only limited observational deficiencies, this psychologist diagnosed autism as Plaintiff requested. Tr. 324-28. Notably, while this diagnosis of autism is reflected as a claimed impairment by Plaintiff in both the prior and current SSI applications and appears for a while in the treating record on lists of medical diagnoses,[9] from a symptom/treatment perspective, it appears nowhere in the more than one thousand pages of mental health and other treating records

---

[9] Both of Plaintiff's treating mental health providers – Drs. Jonathan Dela Luna and Erin Rabideau – began listing autism as a diagnosis in their earliest records from January 2020. As of Dr. Rabideau's last treating note of record in March 2021, autism was still listed as a diagnosis. Tr. 820. However, Dr. Rabideau refused to submit her treating records for the current application, so it is impossible to ascertain if she continued to list it in her treating notes for the period in issue; significantly, she omitted it from the opinions she submitted in support of Plaintiff's application. Tr. 1346, 1835, 1962-63. Also significant, for Dr. Dela Luna's treating notes from January 2022, through his last note recorded on March 8, 2023, he omits autism even as an historic diagnosis. Tr. 1858-61.

that follow the diagnosis.  Put differently, no treating provider mentions autism as an active impairment presenting symptoms requiring treatment.  Nor does Plaintiff rely on autism as a basis for seeking remand.

The prior application record reveals that Plaintiff had no history of special education, was a college student in New York until the COVID pandemic and continued as an online student, "which [Plaintiff] enjoy[ed]," Tr. 514, until the end of 2020.  Tr. 73, 234.  Despite "doing really well in school," Tr. 704, as of February 2021, Plaintiff reportedly "t[ook] a leave from college due to finances."  Tr. 804; see Tr. 653 ("[Plaintiff's] mom . . . is unable to pay for . . . college next semester").  Inconsistently, in the function report for the current application, Plaintiff claimed, "I attempted to attend college but had to leave due to my illnesses."  Tr. 265; compare Tr. 235 (on application, Plaintiff claims, "I dropped out of college in 2020 because of my physical and mental problems"), and Tr. 275 (in function report Plaintiff claims, "I did not complete college due to fatigue and pain.  I tried online college in 2020 but found it too difficult."), with Tr. 514 (2020 statement to treating provider, "doing . . . college courses online [and] enjoys"), and Tr. 703-04 (September 2020 statement to treating provider, "has been doing really well in school").

The prior application's medical treating record reflects that Plaintiff suffered from obesity and complained of significant pelvic pain due to endometriosis, although, providers addressing pelvic symptoms observed either no acute distress or mild distress, with a consistently normal gait.  E.g., 356-62.  After complaining of sleep difficulties, Plaintiff was referred for a sleep study resulting in a diagnosis of mild sleep apnea with a recommendation to lose weight.  Tr. 513, 627-29, 632-33.  Plaintiff was referred to a specialist for evaluation of bilateral hand pain, resulting in entirely normal nerve conduction/EMG findings; carpal tunnel syndrome was

not diagnosed.  Tr. 527-28, 590-95.  A referral for a CT scan and MRI followed complaints of severe chronic sinusitis and resulted in normal findings, Tr. 603-06.  This portion of the record also contains examples that illustrate the alleged "frequency of medical treatment" (ECF No. 14 at 8), which Plaintiff argues supports disability based on absenteeism.  Thus, in just April 2019, Plaintiff's primary care provider twice addressed subjective complaints of blurred vision, ear pain, sinus pain, dizziness, headaches and anxiety, but on examination, Plaintiff was objectively found to be healthy appearing (although overweight), with normal ambulation, clear nasal passages, normal findings in ear/nose/mouth/throat, normal and good air movement in lungs, some tenderness of sinus areas that resolved by the second appointment and normal movement and strength.  Tr. 611-20.  Yet, these records also reflect that antibiotics were prescribed in response to Plaintiff's complaints, despite the lack of a confirming test or a significantly elevated temperature.  Tr. 619-20.

Plaintiff's mental health providers during this period were both practitioners at Providence Behavioral Health – psychiatrist Dr. Jonathan Dela Luna and psychologist Dr. Erin Rabideau.  Both saw Plaintiff regularly (often several times a month) throughout some of the period covered by the prior applications and continued during the current period.  At each appointment during the prior period, they recorded objective mental status examination ("MSE") observations.  As the psychiatrist dealing with medication management, Dr. Dela Luna recorded largely normal MSEs except for occasional anxiety and ruminations but otherwise normal thinking, appropriate dress, adequate grooming, cooperative behavior, and intact memory and attention/concentration.  E.g., Tr. 794-95, 824-25.  Similarly, Dr. Rabideau's therapy notes for this period consistently reflect largely normal MSEs, including appropriate dress, cooperative behavior, good eye contact, normal thoughts, intact memory and intact attention/concentration.

E.g., Tr. 790-92, 818-19, 821-22.  Dr. Rabideau's only adverse MSE findings were sometimes sad/depressed and usually anxious mood.  E.g., Tr. 818-19, 821-22.  Apart from Drs. Dela Luna and Rabideau, all other providers' MSE observations in the prior application record are consistently normal.  E.g., Tr. 844 ("No anxiety or depressive mood noted."); Tr. 853 (same).

Dr. Dela Luna's initial treating note (from an in-person appointment in January 2020) contains not only mental observations, but also observations of such physical matters as normal gait/station, muscle strength and tone.  Tr. 794-95.  Dr. Rabideau's January 2020 appointments were also in-person; her treating notes contain no adverse observations about the need to use a cane or wheelchair.  Tr. 790-92.  After that, all of Dr. Rabideau's encounters with Plaintiff were remote.  In May 2020, during a remote appointment, Dr. Rabideau recorded Plaintiff's report of "using a cane to help with pain management and it has been helpful," Tr. 782-83; although, other providers who had in-person encounters with Plaintiff in the same period observed that Plaintiff's gait was normal.  E.g., Tr. 398 (Rhode Island Hospital physician observes "**Gait** and mobility: w[ithin ]n[ormal ]l[imits], unassisted") (emphasis in original); Tr. 867-68 (nurse practitioner notes normal gait and station); Tr. 871 (pain clinic physician notes normal gait and station).  During this period, both Drs. Rabideau and Dela Luna noted Plaintiff's report of taking on writing commissions.  Tr. 669 ("[s]tated that the writing has helped improve . . . mood and . . . has been planning to make more commission[s], which has felt good . . . has been trying to save some money"); Tr. 744 ("Currently keeping busy by taking on writing commissions and painting.").

During the period prior to the current application, there is reference to a 2018 hospitalization in New York (where Plaintiff attended college) for mental health concerns, but there are no treating notes reflective of this episode.  Tr. 73, 194-95.  Also, in June 2020,

Plaintiff was hospitalized voluntarily for six days (June 24 to 30, 2020) at Fatima Hospital for suicidal thoughts. Tr. 755. At intake, Plaintiff reported mildly depressed mood and after several days of observation was discharged with no change in medication regimen and observations of feeling much better, future oriented, bright, and denying suicidal or homicidal ideation. Tr. 755-56. After this episode, Plaintiff reported (to Dr. Rabideau) the discontinuation of a medication that was taken to treat endometriosis and believed to have increased depression and created suicidal ideation. Tr. 752; see Tr. 73 (SSA expert notes that 2020 hospitalization "due to the side effects of a pain med[ication], which [Plaintiff] has now stopped").

At the reconsideration phase of the prior application, an SSA psychologist and an SSA physician (Drs. Hahn and Grosart) reviewed the record and deployed their expertise to interpret the medically complex materials assembled as of the date of their review. Dr. Grosart assessed limits caused by pelvic pain due to endometriosis but found asthma and hypothyroidism to be non-severe. Tr. 74-76. Dr. Hahn noted Plaintiff was planning to continue college and "often focuses on . . . physical problems" in therapy. Dr. Hahn specifically addressed absenteeism/off-task time, finding that Plaintiff is able to work in two-hour segments over a routine workweek and maintains the capacity to sustain pace with only occasional interruptions and absences. Tr. 73-74, 76-77. These experts collectively found that Plaintiff could perform medium work with additional mental limitations. Tr. 77-78. Based on their administrative findings, Plaintiff's prior application was denied.

Based on this examination of the evidence, I find that this portion of the record contains substantial evidence that is supportive of the ALJ's conclusion that Plaintiff retained the ability to work during the current period (beginning on May 13, 2022, with the filing of the current

16

application).  Put differently, I find that the prior application period evidence does not undermine the ALJ's conclusions.

**B.      Period Following Filing of Current SSI Application on May 13, 2022**

For the current application, the record contains over a thousand pages of records related to Plaintiff's medical treatment (including three opinions from Dr. Rabideau and one from N.P. Gottier).  During this period, Plaintiff was seen by an array of primary care nurse practitioners and physicians at Thundermist, including N.P. Gottier.  Plaintiff went to Thundermist as many as six times per month for such varied complaints as cold symptoms, a lump on the right middle finger and a bruise/tingling following a blood draw.  E.g., Tr. 1503-19.  During this period, Plaintiff continued to see the psychiatrist, Dr. Dela Luna, for medication management, for a total of seven visits, and also continued to see Dr. Rabideau for therapy; however, for this period, the record contains only her three opinions because she declined to provide her treating records. Plaintiff continued to go to hospital emergency departments (six times).  See Tr. 42-43, 1962. With the exception of a three-day hospitalization for observation based on a threat of self-harm (Tr. 1192-1227), all of these resulted in little or no treatment and same-day-discharge home.  Tr. 1157, 1244, 1305, 1697, 1764.  Plaintiff continued treatment at Brigham & Women's Hospital for endometriosis and at Warwick Pain Clinic for pelvic pain related to endometriosis.  And during this period, arthroscopic knee surgery was required to address a meniscus issue.  Tr. 1433.

In addition to the foregoing, Plaintiff was seen on referral by an array of specialists: a cardiologist for baseline tachycardia who observed that Plaintiff had "done fairly well overall," Tr. 896-99; a rheumatologist for joint pain and fatigue whose testing and observations of no tenderness and full range of motion resulted in the diagnosis of no rheumatological disease, Tr. 906-13; an endocrinologist who ruled out Cushing's disease with normal findings on physical

examination and laboratory tests with the observation that the diagnosis was "very confounding," Tr. 996-1026, 1841-54; a pulmonologist whose examinations resulted in all normal findings, Tr. 1347-59; see 1580-84 (asthma "well controlled"); a gastroenterologist who diagnosed fatty liver due to obesity but stated "there is likely no sinister pathology," Tr. 1425-28; an otolaryngologist whose sinus testing (including a scan) yielded normal results, Tr. 1492-98, 1817-21, 1827-32; and a gastroenterologist who opined that liver abnormalities were due to weight and were not cancerous, Tr. 1744-51. Most of these specialists performed MSEs as part of their physical examinations. These consistently yielded normal findings. E.g., Tr. 998 ("Mental Status: Attitude is normal. Mood is normal. Affect is normal."); Tr. 1359 ("Psychiatric: Mood and Affect: Mood normal. Behavior: Behavior normal. Thought Content: Thought content normal. Judgment: Judgment normal."); Tr. 1820 ("Appearance: well developed and nourished . . . Orientation: Alert and oriented to person, place, time. Mood: well adjusted and cooperative").

Throughout the period in issue, Plaintiff continued to complain of sinus, ear, throat, cough and breathing problems and repeatedly sought medical treatment for these concerns. These records reflect a pattern of repeated visits to Thundermist – up to six times in a single month – for what providers generally diagnosed as a viral illness, resulting in minimal or no treatment, except that Plaintiff's persistent complaints sometimes led to prescriptions for antibiotics despite minimal temperature elevation and no confirmation of a bacterial infection. See, e.g., Tr. 1503-18.

Most of the treatment described above is reflected in the portion of the record reviewed and interpreted by the four SSA experts (two physicians, Drs. Mahoney and Pressman, and two psychologists, Drs. Hughes and Ritch) who performed the file review for the current application. Of the total (more than one thousand pages), approximately three hundred fifty pages were

provided after the SSA file review and were seen only by the ALJ.  This post-file-review

treatment reflects complaints and symptoms that are similar to those reflected in the record that

was reviewed and interpreted by the SSA experts, including Plaintiff's frequent subjective

perception of "worsening."  Compare Tr. 1529, 1564, 1597 (complaints of "worsening" in file

reviewed by SSA experts), with Tr. 1611, 1614, 1619 (complaints of "worsen[ing]" in post-file-

review file).  Overall, however, the objective observations in the post-file review record reflect

some improvement.  For example, Dr. Dela Luna's treating notes no longer list the diagnosis of

autism.  See, e.g., Tr. 1858-61.  Further, Dr. Dela Luna notes that Plaintiff was not just

continuing to "do[] some freelance writing work, hired recently by friend to do editing work,"

Tr. 1859, but also was serving as a "primary caregiver" for a family member.  Tr. 1871.  In the

final MSE of record, Dr. Dela Luna recorded MSE observations of appropriate dress and

grooming, cooperative behavior with good eye contact, euthymic and anxious mood, some

fluctuations, normal thought process/content, and intact memory/attention/concentration.  Tr.

1872.  The observation of rumination that appears in the portion of the file reviewed by the SSA

experts is gone.  With a single exception,[10] all other providers in the post-file review period also

made benign MSE observations.  E.g., Tr. 1619 ("PSYCH good eye contact, oriented x 3, normal

speech, judgment in tact, appropriate mood and affect"); Tr. 1843 ("Mental Status: Attitude is

normal. Mood is normal. Affect is normal.").

Throughout these records – both those seen by the SSA experts and those seen only by

the ALJ – are Plaintiff's complaints of fatigue.  However, there is no diagnosis of "chronic

fatigue" until two May 2023 encounters between Plaintiff and N.P. Gottier, at which the latter

---

[10] The single exception is a Thundermist nurse practitioner who noted "depressed" on April 19, 2023.  Tr. 1939-40.
However, the observation at the next appointment (on April 27, 2023) returns to "appropriate mood and affect."  Tr
1936-37.  All subsequent MSE observations at Thundermist are similarly benign.  E.g., Tr. 1893.

lists (for the first and only time) "chronic fatigue" as an "assessment."  Tr. 1927, 1934.

However, the related clinical notes reflect no diagnosis or treatment; instead, as an explanation of

this assessment, N.P. Gottier wrote: "**Chronic Fatigue** Clinical notes: Patient gave provider

forms for disability from lawyer.  Will complete with pt.," Tr. 1934 (emphasis in original), and

"Patient Forms for disability application completed with patient."  Tr. 1927.  N.P. Gottier's

subsequent treating notes in June and July 2023 do not include "chronic fatigue" as a diagnosis

or assessment.  Tr. 1902-03, 1917-19.

During the post-SSA-file-review period, Plaintiff continued the pattern of repeatedly

seeking medical treatment for relatively mild symptoms.  To illustrate with a single sequence in

one month in 2023, on June 2, 2023, Plaintiff saw a nurse for complaints of worsening sore

throat, cough, sinus and ear pain; the nurse recorded no acute distress, a slightly elevated

temperature, no ear symptoms and mild sinus tenderness and diagnosed a viral illness requiring

no medication.  Tr. 1921-23.  The next day, June 3, 2023, Plaintiff went to the Kent Hospital

Emergency Department for similar symptoms; with observations of no more than mild

symptoms, Plaintiff was sent home with a diagnosis of a virus and no follow up or additional

treatment.  Tr. 1697-1741.  Six days later, Plaintiff went back to Thundermist, this time seeing

N.P. Gottier, who did not record a temperature, but noted a runny nose and reddening in the

throat and ears; she prescribed an antibiotic "[g]iven significant bu[r]den of symptoms."  Tr.

1917-19.  Three days after that (on June 12, 2023), Plaintiff was back at Thundermist

complaining of an upper respiratory infection/ear infection and was found on examination to be

"well appearing," with no temperature and no ear infection symptoms; the provider noted that

"Pt seen numerous times for URI complaint/ear pain Has ENT, has not followed up . . . no active

evidence of infection on exam and patient is without fever and well appearing. . . . Per chart

review numerous rx for doxy sent in the past six months." Tr 1914-15.  Four days later (on June 16, 2023), Plaintiff returned to Thundermist and saw a physician for "mild persistent asthma with acute exacerbation" and was prescribed a nebulizer Tr. 1911-12.  Finally, on June 19, 2023, Plaintiff went back to Kent Hospital Emergency Department complaining of thirst, sinus pain, face pain, ear pain, headache, blurred vision and jaw pain.  Tr. 1764-84.  Plaintiff was assessed to be stable and discharged home after a normal CT scan and examination observations of no acute distress, clear speech, normal respiration, normal mood and affect, cooperative and ambulatory with a steady gait (but using a cane).  Id.; see Tr. 1775 ("Exam overall unremarkable, no sinus tenderness, lungs clear . . . on multiple medications that have concerning side effects . . . labs are reassuring").  In all, during this one month in 2023, Plaintiff went to Thundermist four times and Kent Hospital twice for essentially the same complaint with few adverse observations and little prescribed treatment.  For these and other records like them, the ALJ appropriately used common sense to find them to be consistent with those that the SSA experts had interpreted.  Tr. 33.

### C.    Treating Source Opinions – Absenteeism and Off-Task Time

Plaintiff argues that the ALJ erred in finding unpersuasive the opinions from N.P. Gottier and Dr. Rabideau, particularly their opinions regarding work preclusive absenteeism and off-task-time limitations.  As grounds, Plaintiff contends that these opinions are more recent and better supported than the findings of the SSA experts, as well as that the ALJ erroneously failed to articulate how he considered "other factors," such as area of specialty, length and purpose of the treating relationship and frequency of examinations.  ECF No. 11-1 at 44-47; see 20 C.F.R. § 416.920c(b).  Citing Denise D., 2024 WL 3329473, at *7-8, and Jacquelyn V., 2023 WL

371976, at *1, *5-6, Plaintiff contends that this is clear error requiring remand for an award of benefits.  ECF No. 11-1 at 42-43.

The ALJ's detailed analysis of N.P. Gottier's opinion begins by noting that the opinion purports to be entirely based on Plaintiff's subjective report of pain and "chronic fatigue" ("Reported s[ymptoms]- no lab tests for conditions identified," Tr. 1693), and not on endometriosis, which the opinion indicates is diagnosed and managed by Plaintiff's gynecologist.[11]  Tr. 33-34, 1693.  Regarding "pain," N.P. Gottier makes clear that her opinion is based on left "lumbosacral spine" pain and pain in the bilateral "[h]ands/fingers."  Tr. 1694.  However, N.P. Gottier has no treating records supporting either of these in the period in issue – the only complaint related to Plaintiff's spine resulted in N.P. Gottier's finding of "no step offs, non-tender" after back examination in March 2023, Tr. 1950-51, while the only reference to hand/finger pain is the testing done in 2019 based on Plaintiff's complaint of hand-pain, which resulted in entirely normal findings.  Tr. 592-95.  Consistent with this treating record (and inconsistent with the Gottier opinion), Plaintiff's function report reflects no limits in "[u]sing [h]ands."  Tr. 263, 273.  Regarding "chronic fatigue," except for N.P. Gottier's two sessions with Plaintiff to fill in the disability forms, the Thundermist list of established diagnoses does not include either chronic fatigue or chronic fatigue syndrome.  E.g., Tr. 1504, 1951.  And while the record is replete with Plaintiff's report to many providers of past medical history of chronic fatigue syndrome, no record reflects it as an active diagnosis.  Importantly, based on complaints of fatigue, the record reflects that Plaintiff was "seeing a rheumatologist for work-up of possible

---

[11] It is important to recall that the ALJ's rejection of the Gottier opinion as non-persuasive did not cause him to ignore the limitations caused by Plaintiff's chronic abdominal pain from endometriosis.  Thus, the non-examining experts credited Plaintiff's complaints of chronic abdominal pain.  Tr. 89-90, 100-01.  And the ALJ found that this pain was significant and relied on it in limiting Plaintiff to sedentary work with additional postural limits.  Tr. 32, 35.

chronic fatigue syndrome versus fibromyalgia," Tr. 1375, but the rheumatologist did not

diagnose any such impairment.  Tr. 910 ("There is no Rheumatological disease at this point and I

have not arranged any follow up.").  Consistently, regarding Plaintiff's report of chronic fatigue

syndrome, a physical therapist noted in 2023 that there is "no specific d[iagnosis] given."  Tr.

1577.  Thus, as the ALJ supportably found, the Gottier opinion "appears to have been completed

as an accommodation to the claimant," Tr. 34, a finding that is corroborated by N.P. Gottier's

treating notes for the appointments at which she received and filled in Plaintiff's disability forms,

as well as by the Gottier opinion's reliance on symptoms that no treating source had ever

diagnosed, not only chronic fatigue, but also carpal tunnel syndrome, ruled out in 2019, Tr. 592-

95, and "Multiple tender points," Tr. 1694, which the rheumatologist did not find.  See Tr. 86

("Musculoskeletal and joint exams normal").

     In considering the Gottier opinion, the ALJ appropriately noted that its social limitations

(so severe that Plaintiff frequently cannot leave the house) and its limits on the ability to respond

to customary work pressures clash with Plaintiff's statements regarding participation in activities

(including socializing and serving as primary caretaker for a family member), with Plaintiff's

ability to leave the house to attend numerous medical appointments without missing any, and

with many normal MSE findings of normal behavior, judgment, thoughts, memory, and

attention/concentration.  Tr. 33.  The ALJ further noted that the opinion's extreme exertional

limitations impacting standing/walking are unsupported and in conflict, for example, with the

records reflecting Plaintiff's good recovery following knee arthroscopy, with no complaints of

significant pain or dysfunction, and observations of excellent range of motion, no tenderness and

no limits by July 2023.  Tr. 34 (referencing Tr. 1813-15).  And Plaintiff's argument that the

ALJ's treatment of the Gottier opinion requires remand because the ALJ failed to consider "other

factors" is legally off-base, in that 20 C.F.R. § 416.920c(b) requires articulation of "other factors" only when opinions are equally well supported and consistent, which is not the case here, but also because the foundation for the argument is simply inaccurate in that the ALJ <u>did</u> <u>articulate</u> consideration of "other factors," specifically noting that N.P. Gottier's treating relationship was limited to "Quarterly appointments," in that she was only one of the many providers Plaintiff saw at Thundermist.  Tr. 34.

Most importantly, the ALJ specifically tackled N.P. Gottier's absenteeism and off-task time opinions, finding that they are conclusory, unsupported and inconsistent with objective studies and the treatment Plaintiff received.  Tr. 34.  This finding is supported by N.P. Gottier's own treating notes, which reflect largely normal physical examinations during the prior application period and the period in issue (both before and after the SSA experts' file review). <u>See, e.g.</u>, Tr. 1100 (at November 2021 appointment, Plaintiff observed to be in no acute distress with normal breathing, and good eye contact; no observations of limits on walking/standing); Tr. 1514-15 (at October 2022 appointment, Plaintiff observed to be in no acute distress, pleasant, with good eye contact, normal affect, appropriate mood, normal breathing, and no abdominal tenderness; treatment recommendations: heathy diet and regular physical activity; no observations of limits on ability to walk/stand); Tr. 1902-03 (at July 2023 appointment, Plaintiff observed to be in no acute distress, with normal breathing, extremities and good eye contact; no observations of limits on ability to walk/stand); Tr. 1950-51 (at March 2023 appointment, Plaintiff observed to be in no acute distress, with normal breathing, no ear findings, no musculoskeletal or extremity issues, no back tenderness and good eye contact; based on Plaintiff's report, antibiotic continued; no observations of limits on ability to walk/stand). Indeed, N.P. Gottier's physical examinations during the same month when she met with Plaintiff

to complete the disability paperwork (and assessed chronic fatigue for the first and only time) yielded normal findings that are inconsistent with and afford no support for her contemporaneous opinion.  See Tr. 1693-96, 1930-34.  Significantly, the Gottier absenteeism/off-task opinion does not purport to rely on the many times Plaintiff appeared seeking treatment at Thundermist for cold/sinus/ear pain/asthma/sore throat symptoms, although these visits were the primary focus of N.P. Gottier's treatment and are the basis for Plaintiff's argument that the sheer volume of such appointments is work preclusive.  See Tr. 1693-96.  Rather, the Gottier opinion rests on "chronic fatigue," which is not one of Plaintiff's diagnoses and back/hand pain that is not reflected in the Gottier treating record.  See id.

Based on the foregoing, I find that the ALJ's approach to the Gottier opinion is consistent with applicable law and well supported by substantial evidence.  I find no error either in the ALJ's finding that the Gottier opinion is not persuasive and in his specific finding both that the record lacks evidence to support the Gottier absenteeism and off-task time opinions, as well as that this aspect of the opinion is not consistent with the objective treating record (including N.P. Gottier's own notes).

Turning to Dr. Rabideau's three opinions (Tr. 1346, 1835-36, 1962-63), the ALJ appropriately relied on Dr. Rabideau's refusal to provide her supporting treating records to find that they are unsupported.  Tr. 34-35.  Further, the ALJ relied on his well-supported finding of inconsistency between the Rabideau opinions and the overall record.  Id.  By way of a few examples, the Rabideau opinion that Plaintiff suffers from "disheveled and ungroomed appearance," Tr. 1962, clashes with the contemporaneous observations by Dr. Dela Luna that Plaintiff consistently exhibited "[a]dequate [g]rooming and [h]ygiene."  Tr. 1860, 1866, 1872.  Similarly, Dr. Rabideau's opinion that Plaintiff cannot walk without a wheelchair or cane,

resulting in the inability to leave the house even for medical treatment, Tr. 1962, is not only unsupported but also clashes dramatically, for example, with the orthopedist's opinion that Plaintiff had recovered well from knee surgery and that can "continue with all activities as tolerated," Tr. 1813-14, as well as with Plaintiff's repeated attendance at in-person medical encounters with providers other than Dr. Rabideau.  Also inconsistent with the treating record is Dr. Rabideau's reliance on her misunderstanding that Plaintiff "ha[s] been hospitalized approximately once per month over the past several months due to physical health issues related to pain severity and/or breathing difficulties."  Tr. 1962.  No such hospitalizations are reflected in the medical record; rather, the record for the months preceding when Dr. Rabideau signed this aspect of her opinion reflects three instances where Plaintiff sought treatment at the Kent Hospital Emergency Department but was discharged home without admission based on largely normal observations, including well-appearing and normal gait, strength, range of motion and mood/affect.  Tr. 1662-64, 1709, 1711, 1775, 1777.  And the Rabideau opinions are materially inconsistent with the Dela Luna treating notes, which reflect his MSE observations of intact memory and attention/concentration, as well as with Plaintiff's activities, including freelance writing for commissions and acting as primary caregiver for a family member, Tr. 1859-60, 1866, 1870-72.

Based on the foregoing, I find no error in the ALJ's approach to the Rabideau opinions; I further find that the ALJ's determination not to adopt their absenteeism/off-task limitations is well supported by substantial evidence.  I further find that this case differs materially from Denise D., 2024 WL 3329473, at *7-8, and Jacquelyn V., 2023 WL 371976, at *1, *5-6, where the evidence of absenteeism/off-task time was undisputedly established *inter alia* by the recurrence of a work preclusive number of hospital admissions or in-office procedures to provide

medically necessary treatment (such as IV hydration, IV administration of pain medication and medication infusions) available only in the hospital or medical office setting. Accordingly, I do not recommend remand either for an award of benefits or for further proceedings to consider absenteeism or off-task time.

### D.    SSA Experts' Prior Administrative Findings

Plaintiff's challenge to the ALJ's reliance on the findings of the SSA experts rests largely on their failure to review and interpret the post-file review portion of the record. The problem with this argument is that Plaintiff fails to highlight any specific record that would "detract[] from the weight that can be afforded [to the SSA findings]." Ruben M., 2020 WL 39037, at *9. Having thoroughly reviewed the entirety of that portion of the record, I find that the ALJ's approach is well supported. Thus, I find that this is a case where the ALJ appropriately reviewed the post-file review records without the assistance of a medical expert and made the common-sense determination that they do not reflect objective worsening or symptoms more serious than those in the records seen by the non-examining experts. See Michele S., 2019 WL 6242655, at *8. Because they do not, remand for further review based on this argument would inappropriately render an SSA opinion irrelevant merely because the expert was not privy to updated medical records, which "would defy logic and be a formula for paralysis." Kane C., 2022 WL 168043, at *7. That I decline to recommend.

### E.    ALJ's Treatment of Plaintiff's Subjective Statements

This record is loaded with instances of inconsistencies that afford ample support for the ALJ's determination that Plaintiff's subjective statements about the extreme severity of symptoms are not entirely credible.

To take one example appropriately highlighted by the ALJ, Plaintiff claimed in the reconsideration phase function report that the cane was "prescribed by a doctor." Tr. 274. The treating record confirms that Plaintiff was observed using the cane and, when asked why, told providers it was "due to chronic fatigue," a syndrome that was not diagnosed. Tr. 1569. The record contains no prescription for a cane nor did any treating source recommend use of a cane including for chronic fatigue syndrome. To the contrary, treating sources consistently observed normal gait (except during period impacted by the knee injury that was addressed by arthroscopic surgery). E.g., Tr. 518, 852-53, 891. Further, within weeks of the knee arthroscopy, treating providers opined that Plaintiff "has been weightbearing as tolerated," Tr. 1567; within four months, providers opined that Plaintiff was "doing very well" and should "continue increasing . . . daily activities as tolerated" and do home exercises; within eight months, providers opined to no limits: "continue with all activities as tolerated." Tr. 1813-14, 1816.

The ALJ's credibility analysis also appropriately juxtaposes Plaintiff's extreme statements about the severity of asthma with the treating record findings that asthma is generally well controlled, Tr. 1582, and that exacerbations are caused by viral or bacterial illness, with no hospital admissions and no observation of severe breathing symptoms.[12] Tr. 30-31. And the ALJ properly noted the inconsistency between Plaintiff's description of spending most of every day in bed or in a recliner, Tr. 55, with the report to Dr. Dela Luna of serving as the primary caregiver for a family member. Tr. 1871. Importantly, the ALJ accepted as credible Plaintiff's

---

[12] Regarding asthma symptoms, the Court notes that the pulmonology office that treated Plaintiff for asthma in 2022 specifically recorded that Plaintiff is allergic to cats, yet has cats at home but "denies significant allergy symptom around own cats." Tr. 1347.

subjective complaints of pelvic pain from endometriosis and set significant RFC limits to accommodate such pain.  Tr. 32, 35.

Based on these examples of well supported inconsistencies, I find that this is not a case where the ALJ committed the error condemned by <u>Sacilowski</u>, 959 F.3d at 441 (without evidence that directly rebuts claimant's testimony or presents reasons to question credibility, ALJ must take claimant's statements as true).  I do not recommend remand for either for an award of benefits or for further proceedings based on the ALJ's approach to Plaintiff's subjective statements.

## VI.    <u>Conclusion</u>

Based on the foregoing analysis, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 11) be DENIED and Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 12) be GRANTED.  Any objections to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen days of service of this report and recommendation.  <u>See</u> Fed. R. Civ. P. 72(b); DRI LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  <u>See</u> <u>Brenner v. Williams-Sonoma, Inc.</u>, 867 F.3d 294, 297 n.7 (1st Cir. 2017); <u>Santos-Santos v. Torres-Centeno</u>, 842 F.3d 163, 168 (1st Cir. 2016).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
April 24, 2025